## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **RALPH EDWARD PARKER,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:19-CV-740-KOB** |
| | ) | |
| **ANDREW M. SAUL,** | ) | |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Ralph Parker, the claimant, protectively filed for a Title II application for a period of disability and disability insurance benefits on January 2, 2018. The claimant initially alleged disability commencing December 30, 2017 because of irregular heartbeat, Major Depressive Disorder, PTSD, Hepatitis C, elbow problems, sleep apnea, high blood pressure, tinnitus, and problems with his feet. (R. 15, 74, 192, 234). The Commissioner denied the claims on March 1, 2018, and the Administrative Law Judge held a video hearing on September 5, 2018. (R. 12, 37, 96).

In a decision dated December 4, 2018, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and was, therefore, ineligible for social security benefits. (R. 15-31).  On March 28, 2019, the Appeals Council denied the claimant's request for review. (R. 1).  Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated

below, this court REVERSES and REMANDS the decision of the Commissioner.

## II.     ISSUE PRESENTED

Whether the ALJ erred because substantial evidence does not support her decision to exclude in the residual functional capacity assessment any mental limitations regarding the claimant's ability to concentrate or pay attention.

## III.     STANDARD OF REVIEW

The court's scope of review is limited to determining (1) whether substantial evidence exists in the record as a whole to support the findings of the Commissioner, and (2) whether the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker* F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

This court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or

2

substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210

(11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of

certain facts, the court has no power to reverse that finding as long as substantial evidence in the

record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the

[Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look

to those parts of the record that support the decision of the ALJ, but also must view the record in its

entirety and take account of evidence that detracts from the evidence relied on by the ALJ.

*Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV.    LEGAL STANDARDS

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person

is unable to "engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C.

§ 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential

evaluation process:

> (1)  Is the person presently employed?
> (2)  Is the person's impairment severe?
> (3)  Does the person's impairment meet or equal one of the specific
> impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4)  Is the person unable to perform his or her former occupation?
> (5)  Is the person unable to perform any other work within the
> economy?

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520, 416.920; *see*

*also Taylor v. Acting Comm'r of Soc. Sec. Admin.*, 761 F. App'x 966, 967 (11th Cir. 2019).

---

[1] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case
(SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are

After an ALJ finds that the claimant has at least one severe impairment in step two, she must evaluate the claimant's residual functional capacity.  An RFC assessment measures the most a claimant can do despite the mental and physical limitations arising from medically determinable impairments and related symptoms. SSR 96-8p; *see also 20* C.F.R. § 404.1545(a). An RFC assessment is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p.

In making this finding, the court must consider all the claimant's impairments, both severe and non-severe. 20 C.F.R. § 404.1545(c). The ALJ classifies a mental impairment as severe or non-severe after an assessment of the claimant's degree of functional limitation. 20 C.F.R. § 404.1520a(c). In determining the claimant's degree of mental functional limitation, the ALJ considers four broad, functional areas: understand, remember or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. *Id.* Based on an assessment of the four broad functional areas, the ALJ should rate a claimant's degree of limitation on a five-point scale: none, mild, moderate, marked or extreme. *Id.* If an impairment's degree of functional limitation is classified at "none" or "mild," then the impairment is not severe unless the evidence indicates otherwise.  A "moderate," "marked," or "extreme" limitation indicates a severe impairment that more than minimally limits a claimant's ability to work.  20 C.F.R. § 404.1520a(d).

The RFC assessment must account for all relevant medical evidence and consider the claimant's ability to "meet the physical, mental, sensory, and other requirements of work." *Id.* The ALJ must consider the claimant's ability to concentrate and pay attention when determining his ability to work. *Id.* But, the ALJ need not include mental limitations in the RFC analysis if

---

appropriately cited as authority in Title XVI cases. *See, e.g.*, *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

substantial evidence in the record does not suggest the impairment impacted the claimant's ability

to work. *See Winschel v. Comm'r Soc. Sec. Admin.*, 631 F.3d 1176, 1181 (11th Cir. 2011).

## V.    FACTS

The claimant was 60 years old at the time of the ALJ's final decision. The claimant

graduated from high school and has an associate degree in accounting. The claimant served in the

United States Marine Corps from 1976 to 1980, and, in December 2017 at the age of 60, retired

from the Postal Service after working for 34 years. The claimant engaged in no substantial gainful

activity since his retirement in December 2017 and alleges disability based on irregular heartbeat,

Major Depressive Disorder, PTSD, Hepatitis C, elbow problems, sleep apnea, high blood pressure,

tinnitus, and problems with his feet. (R. 1, 44-45).

### *Mental Impairments*

The claimant reported a depressed mood and mood changes to Dr. Noah Fitzpatrick at

Southview Medical Group on June 22, 2011.  Dr. Fitzpatrick diagnosed the claimant with non-

severe/non-serious depressed mood; noted that the claimant had no psychiatric issues except for

some mood changes; and prescribed Citalopram Hydrobromide for the claimant's depression.  (R.

280-97).[2]

On September 29, 2017, the claimant visited Dr. Jacob P. Elrod at the Birmingham VA

Medical Center to establish care with the VA because he was planning to retire at the end of 2017.

The claimant said he considered himself "healthy," but described his history of "major depression

that waxes and wanes."  He stated that he is happily married "despite struggling with major

depression"; had made no suicide attempts; denied any hallucinations; scored a 1 on the PHQ-2 test

that indicated a "negative screen for depression"; reported "feeling down, depressed or hopeless"

---

[2]  The court can find no mental health visit records for the claimant between 2011 and 2017.

on "several days"; scored a 1 out of 4 when screened for PTSD indicating a "negative" screening for PTSD; and reported being "on guard, watchful, or easily distracted." The claimant's active problem list included a diagnosis of major depressive disorder, and the claimant's review of systems indicated that he suffered from anxiety and depression. (R. 548, 550, 553, 558-59).

The claimant visited Dr. Carin Eubanks, a psychologist at the Birmingham VA Medical Center, for an initial assessment on October 19, 2017. The claimant's chief complaints were depression and anger that began during his military service. The claimant also voiced concerns about low mood; some fatigue; some trouble concentrating; periods of hopelessness and worry; and suicidal thoughts. The claimant also admitted he used cocaine and heroin in the past but has been clean since 2000.

Dr. Eubanks' diagnostic impression as well as a PHQ-9 screening indicated that the claimant suffered from depression based on the claimant "feeling down, depressed, and hopeless"; "feeling tired or having little energy"; overeating; having "trouble concentrating on things, such as reading the newspaper or watching television"; and having thoughts that he would be better off dead, or of hurting himself in some way.  The claimant reported that these symptoms make it "somewhat difficult" to "work, take care of things at home or get along with other people."  Dr. Eubanks' plan for the claimant was to meet with a nurse practitioner for "psychotropic medication management" and to begin psychotherapy with April Fordyce, LICSW.  (R. 439-42).

On October 23, 2017, the claimant called the national VA suicide prevention hotline. The claimant spoke with the hotline responder, Kay Harris, for twenty-eight minutes. The claimant said he suffered from mental illness, economic problems, and concerns about his benefits and payments. He reported suicidal ideation without intent in the prior two months; a suicide attempt "in the 80s in the context of his drug use"; and recent mental health treatment he thought was going well.  Ms. Harris' clinical impression indicated only a moderate to low suicide risk. (R. 528-29).

April Fordyce, a Licensed Clinical Social Worker (LCSW), first met with the claimant at the Birmingham VA Medical Center on November 1, 2017 for a supportive psychotherapy session to treat the claimant's depression. The claimant arrived at the appointment neatly groomed, casually dressed, and eager to set goals for the therapy. The claimant said he sought counseling in the past at Ingram & Associates[3] and that he engaged in talk therapy once a month; Ms. Fordyce stated, "it appears that much of his treatment was pharmacological." He mentioned his plans to retire from the U.S. Postal Service; admitted that his finances were a significant source of stress in his life; said he feared losing his home until he received notice of back-pay from his PTSD service-connection that would allow him to catch up on his house payments; and said his financial strain tended to contribute to his marital discord as well.

Ms. Fordyce noted at this visit that the claimant reported continued "periods of low mood, anger outbursts, some fatigue, some trouble concentrating," and "periods of hopelessness and worry."  She noted that the claimant had "some limitations" in his insight and judgment, but that he made appropriate eye contact; had fluent, unpressured, and easy-to-understand speech; had an appropriate and cooperative behavior; had a euthymic mood; had no disturbance in thought; had goal-directed thought processes; had average intellect; and utilized "faith and spirituality as a means of positive coping." She noted that the claimant "plans to work in other fields upon retirement" and "has [his] real estate license."  (R. 523-25).

After missing an appointment on October 24, 2017, the claimant returned to the Birmingham VA Medical Center on November 7, 2017 and saw Nurse Practitioner Jaenelle Grace for a mental health evaluation for his PTSD and depression. The claimant said Dr. Hutson diagnosed him with PTSD and depression at the Birmingham VA Medical Center in 2011.[4] The

---

[3]  The court can find nothing in the record from the claimant's counseling sessions at Ingram & Associates.

[4] The court can find in the record no mental health records from the VA Medical Center in 2011.

claimant mentioned that "ebenefits" recently notified him of his service connection for his PTSD.

Also, the claimant expressed disinterest in psychotropic medications after he said he had a negative

experience with such medications prescribed by a psychiatrist at St. Vincent's hospital.

At the November 7 visit, the claimant reported "thoughts about ending my life"; depressed

mood for three of the last fourteen days; passive suicidal thoughts three to four times a week

driving home from work "about driving his car into oncoming traffic"; excessive worrying at times

that is hard to control; restlessness "1-2 times a week"; and difficulty falling asleep. He reported

"experiencing trauma while he was deployed to the Philippines" and witnessing another Marine

almost lose his hand and burn his hand to show how little feeling he had left.  The claimant denied

difficulty concentrating, hopelessness; panic attacks; and irritability at this visit. The Birmingham

VA Medical Center assessed the claimant's PTSD using a PC-PTSD screening tool, and the

claimant scored a 0/4. The claimant's diagnosis included insomnia, "R/O PTSD, and R/O major

depressive disorder, recurrent mild."[5]  NP Grace prescribed the claimant 25mg of Trazadone to

help him sleep better at night. (R. 512-17).

On December 5, 2017, the claimant returned to the Birmingham VA medical center for a

psychiatry appointment to treat his anxiety, depression, and insomnia. The claimant reported better

sleep with Trazadone and his chiropractic treatments, but he said he suffered from nightmares

about once or twice a week about running from danger. He stated that he continued to have

"passive suicidal thoughts while driving home but they have decreased" to once or twice a week

and he still experienced some irritability and restlessness "but is able to control it."  (R. 466).

At the December 5 visit, the claimant said his improved sleep decreased his depression,

anxiety, and suicidal ideations. Also, the claimant reported a decrease in his excessive worrying

because of his increased funds from his service connected compensation for depression.  He noted

---

[5]  "R/O" indicates that the condition may be present but cannot be diagnosed "cleanly."

a month had passed since his retirement,[6] and he intended to work out daily and wanted to open his own Allstate Insurance office to keep busy.  (R. 466-73).

The claimant's PTSD screening score increased from a 0/4 on November 7, 2017 to a score of 1/4 at this visit.  NP Grace diagnosed the claimant with "Insomnia, due to a medical condition"; "Depression, unspecified"; and "Anxiety, unspecified."  She continued the claimant's prescription for trazadone to help him sleep.  (R. 466-73).

The claimant first visited Dr. Sterling Taylor, a licensed psychiatrist not associated with the VA, on December 13, 2017, per the recommendation of a friend. Between December 13, 2017 and August 14, 2018, the claimant saw Dr. Taylor on eight occasions.  Dr. Taylor's notes from the August 13, 2017 visit indicate that the claimant suffered from anxiety; that Dr. Taylor did not "independently confirm presence of PTSD"; and that Dr. Taylor agreed with the claimant's previous diagnosis of Major Depressive Disorder. The "Patient Progress Notes" for all eight visits consisted of a list of different categories with checked boxes under each one.

The only variation in the checked boxes for each of the claimant's psychiatry sessions with Dr. Taylor from December 13, 2017 to August 14, 2018 was the checked box next to "suicidal ideations" on the claimant's first visit but unchecked box for that symptom on the remaining visits. The other checked boxes were identical for each visit and indicated that the claimant appeared alert and anxious and reported his symptoms of anxiety as worry, panic attacks, and irritability.  The checked boxes also indicated that the claimant had good eye contact; a normal gait; logical, linear, and coherent thought processes; a normal affect; no evidence of psychosis; symptoms of depression; no hallucinations or illusions; good insight and judgment; good attention and concentration; and intact recent and immediate memory.  Based on his evaluations of the claimant,

---

[6]  The claimant stopped working in November and used sick leave through his official December 30, 2017 retirement date.

Dr. Taylor independently diagnosed the claimant with recurrent, severe, major depressive disorder. (R. 674-92).

At the request of the Disability Determination Service (DDS), Dr. Taylor wrote a letter on February 1, 2018 offering his opinion on whether the claimant was disabled such that he could not work. The letter included Dr. Taylor's diagnosis of severe Major Depressive Disorder and opinion that the claimant's depression was "serious." Dr. Taylor noted that the claimant had just retired from the Postal Service and that "he found his job overwhelming." Dr. Taylor said he did not independently diagnose the claimant's PTSD, but he noted the claimant said the VA diagnosed him with PTSD. Additionally, Dr. Taylor said the claimant reported dysphoria; anhedonia; impaired sleep and appetite; persisting fatigue; poor concentration; inappropriate guilt; passive death wishes; and suicidal ideation. However, Dr. Taylor admitted he had only seen the claimant twice[7] for individual psychotherapy and concluded that he had insufficient information to determine whether the claimant was disabled such that he could not work. (R. 594).

The claimant completed his function report on February 2, 2018 at the request of the Social Security Administration. In that report, the claimant said he took care of and provided for his wife. However, the claimant said his disabilities impacted his ability to lift, bend, squat, reach, and put on his shoes and that the pain occasionally disturbed his sleep. The claimant said he prepared his own meals about once a week, but that he changed his cooking habits since the onset of his disability. Also, the claimant said he could manage his own personal care; manage his medications; do laundry; iron; drive; shop in stores; manage his finances; bowl; read; spend time with his family and friends; go out to dinner; attend church; pay attention for about fifteen minutes; finish what he

---

[7] Although at the time of the letter, Dr. Taylor had seen the claimant "twice," the record contains "Patient Progress Notes" with checked boxes "digitally signed" by Dr. Taylor for a total of eight visits: December 13, 2017; January 10, 2018; February 6, 2018; February 27, 2018; April 3, 2018; June 5, 2018; July 10, 2018; and August 14, 2018.

starts; follow written and spoken instructions; leave to go places without reminders; and get along with authority figures. (R. 219-225).

On February 13, 2018, the claimant returned to the Birmingham VA Medical Center for another supportive psychotherapy treatment with April Fordyce, LSCW. He reported ongoing depression, and Ms. Fordyce's notes indicated that the claimant "does continue to endorse periods of low mood, anger outbursts, some fatigue, some trouble concentrating, periods of hopelessness, and worry" and difficulty staying asleep. He noted that he retired since his last session and that he successfully paid his house payments with the money he received in back pay for his VA disability. The claimant said he wanted to pursue other business ventures and create positive changes in his life, physical health, and relationship with his spouse. (R. 656-657).

The claimant's mental status examination on the February 13 visit indicated that the claimant had a euthymic mood; no disturbance in thought; a goal-oriented thought process; was casually dressed; and was of average intellect. A PHQ-9 assessment suggested the claimant had mild depression as the claimant said his depression occasionally impacted his ability to concentrate on things like reading the newspaper or watching TV. (R. 656-60).

At the request of the Social Security Administration, on March 1, 2018, Dr. Robert Estock performed a mental residual functioning capacity assessment on the claimant by reviewing the claimant's records. Dr. Estock found that the claimant had "Depressive, Bipolar, and Related Disorders" and listed it as "Severe" and that the claimant was moderately limited in his ability to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage himself. Dr. Estock specifically noted that the claimant could maintain concentration for about two hours with all customary breaks; he would need a "well-spaced work environment" for "maximum concentration";  and he could carry out short, simple tasks and instructions, but would have "more difficulty with more detailed tasks and instructions." He found

11

that the claimant was moderately limited in his ability to interact appropriately with the general

public such that interaction with public should be "infrequent and non-intensive"; to accept

instructions and respond appropriately to criticisms from supervisors such that supervision should

be "tactful and constructive and non-threatening"; and to respond appropriately to changes in the

work setting. (R. 75-88).

The claimant returned to the Birmingham VA Medical Center for a psychiatric visit with

NP Grace on March 13, 2018 and complained about how "it could always be better." The claimant

reported that he felt "kind of down" and had difficulty refinancing his home and noted an increase

in marital discord and intimacy issues. He also reported "difficulty concentrating (getting 'side

tracked' on tasks)"; passive suicidal thoughts about "driving off the road and 'something happening

to him'"; "broken" sleep with nightmares "on and off"; and anxiety as a four on a ten-point scale.

He scored a 2/4 on his PTSD screening but noted that he looked forward to his family reunion in

July.  NP Grace recommended antidepressant medications, but the claimant declined and

"described a previous bad experience with an antidepressant prescribed from a NON-VA

physician. Reports he felt 'awful' and threw the medicine bottle away."  NP Grace diagnosed the

claimant with Major Depressive Disorder, recurrent, moderate and continued his prescription for

trazadone to help him sleep. (R. 641-46).

The following week, on March 20, 2018, the claimant had another supportive

psychotherapy session at the Birmingham VA Medical Center with April Fordyce, LCSW, for the

claimant's ongoing depression. The claimant said he slept "ok most nights" but has some difficulty

staying asleep; has periods of low mood and anger outbursts; has some fatigue; has some trouble

concentrating; and periods of hopelessness and worry.  He indicated no suicidal thoughts at that

visit and the mental status examination indicated that he appeared to be alert and oriented;

exhibited a euthymic mood; showed no disturbance in thought; had a goal-directed thought process; and possessed average intellect. (R. 635-37).

The Department of Veterans Affairs sent a letter to the claimant on April 23, 2018 informing the claimant that his disability benefits for his depression and PTSD increased from 50% to 100%. The letter indicated that the VA reviewed all of the claimant's medical records from 2011 to 2018 and increased his PTSD disability to 100% because of the claimant's "Major Depressive Disorder (also claimed as posttraumatic stress disorder)" based on his depressed mood; suicidal ideation; "near-continuous depression" affecting his ability to function effectively; disturbances of motivation and mood; chronic sleep impairment; difficulty in adapting to stressful circumstances; difficulty in adapting to "work" and a "worklike" setting; and difficulty in establishing and maintaining effective work and social relationships." (R. 236-43).[8]

At his April 27, 2018 follow-up visit at the VA with internist Dr. Jacob Elrodm, the claimant reported that "his mood is better since he has been following up with mental health," but "he still has fleeting thoughts of driving into oncoming traffic." He said he has no plans to drive into oncoming traffic and feels that those thoughts are "more impulsive than anything." (R. 729-30).

On May 11, 2018, the claimant saw April Fordyce, LCSW, for another supportive psychotherapy appointment to treat his depression. The claimant reported "ongoing issues with negative thoughts and other symptoms of depression"; occasional difficulty with sleep; occasional interpersonal issues; low mood; anger outbursts; some fatigue, some trouble concentrating; periods

---

[8]  For claims filed after March 27, 2017, an ALJ no longer must provide analysis in her decision about a decision made by any other governmental agency about whether the claimant is disabled or entitled to benefits. *See* 20 C.F.R. § 404.1504. But the ALJ should "consider all of the supporting evidence underlying the other governmental agency. . . ." *Id.*

of hopelessness; and worry.  But the claimant said he was looking forward to the two upcoming trips that he had planned. (R. 726-727).

At a follow-up with NP Grace at the Birmingham VA Medical Center on June 12, 2018, the claimant said he experienced "an episode" three weeks prior while cutting the grass that consisted of suicidal ideations of hurting himself with the lawnmower blade. He also had passive suicidal thoughts while his wife drove them back from Florence, Alabama about driving off elevated roads while traveling.  NP Grace's mental status exam revealed that the claimant had a fair mood; fair insight and judgment; "situational irritability and low frustration tolerance"; almost no anxiety at that visit; and no current suicidal intent or plan. The claimant again scored a 2/4 on his PTSD screening. The claimant reported dissatisfaction with the twenty-five pounds he gained since retirement but said he exercised three times a week and planned to begin the MOVE! workout program soon. Also, the claimant reinforced his love for traveling and said he looked forward to his trips to South Carolina and Barcelona.

NP Grace's diagnosis on the June 12 visit included "Chronic recurrent major depressive disorder," "moderate."  Although he was reluctant to take any psychotropic medications, the claimant agreed to take Bupropion "instead of first line SSRI's," like the ones on which he had a bad experience in the past.   (R. 717-18).

On June 16, 2018, the claimant went to the Birmingham VA Medical Center for a nutrition/dietetics consultation with Clinical Dietitian, Kimberly Chism. The claimant said he started the MOVE! workout orientation, ate three meals a day, and walked 1-2 miles on his treadmill on four to five days a week. The claimant expressed motivation to "lose his belly" and considered adding push-ups and sit-ups to his workout regimen as well. (R. 695-96).

On June 22, 2018, the claimant had another supportive psychotherapy appointment with April Fordyce, LCSW, at the Birmingham VA Medical Center for his depression. The claimant

14

reported ongoing issues with negative thoughts and other depression symptoms, including occasional difficulty sleeping, occasional interpersonal issues, periods of low mood, anger outburst, fatigue, trouble concentrating, and worry. He said he had not yet begun taking Buproprion because he feared taking the medication based on his past negative experience with psychotropic medication. His mental status examination revealed an anxious, frustrated, congruent mood with some limitations in his insight and judgment.

The claimant said his primary concern at this visit was with his ongoing marital issues and his physical and emotional intimacy issues with his wife. His financial situation improved and was no longer a major stressor in his life and he expressed a desire to create positive change in his life, health, and marriage and looked forward to traveling. (R. 713-14).

The claimant returned to NP Grace at the Birmingham VA Medical Center for another psychiatric appointment on July 17, 2018. The claimant reported all around improvement and said his mood was better since starting Buproprion. The claimant reported higher energy levels and improvement in his irritability, depression, and anxiety symptoms. The claimant said his marital discord sometimes caused a low mood, but he said he desired positive change; his sleep was "fair" and denied difficulty falling asleep initially with the Trazadone; he has nightmares "every now and then"; his PTSD screening score decreased to a 1/4; and he looked forward to his upcoming family reunion in Charleston and his trip to Barcelona in September. NP Grace's diagnosis included "Chronic recurrent major depressive disorder," "moderate"; she assessed the claimant had fair insight and judgment; and she continued the claimant on Buproprion and Trazadone. (R. 703-710).

At his visit with April Fordyce, LCSW, at the Birmingham VA Medical Center on July 24, 2018, the claimant reported as his "Presenting Problem" his "ongoing depression" and "ongoing issue with negative thoughts and other symptoms of depression." He reported periods of low mood, anger outbursts, some fatigue, some trouble concentrating; and difficultly staying asleep.

The "Mental Status Examination" section noted that the claimant had an anxious, frustrated and congruent mood; some limitations in insight and judgment; and no disturbances in thought. He stated that his marital issues were his primary concern but that he enjoyed his trip to South Carolina for his family reunion. The claimant expressed a desire to better his relationship with his wife; improve himself; and create positive change in all areas of his life. (R. 698-700).

*Physical Impairments*

Although the claimant's issue here pertains to his mental impairments, his numerous physical impairments paint a complete picture of his alleged limitations. In June of 2011, Southview Medical Group's Dr. Noah Fitzpatrick first treated the claimant for osteoarthritis of the shoulder. Dr. Fitzpatrick treated the claimant five times from June of 2011 to August 2012 and diagnosed the claimant with the physical impairments of shoulder osteoarthritis, chronic Hepatitis *C*, obstructive sleep apnea, dyslipidemia, hypertension, and reflux. (R. 280-97).

The claimant also sought treatment from cardiologist Dr. Sanjeev S. Hasabnis at Brookwood Medical Center. The medical records indicate Dr. Hasabnis treated the claimant on many occasions from December of 2015 to June of 2018. Dr. Hasabnis diagnosed the claimant with atrial flutter, atrial fibrillation, cardiomyopathy, hypertension, reflux, sleep apnea for which the claimant used a CPAP machine, and Hepatitis C. (R. 306, 320).

Dr. Vance Estes at Estes Chiropractic treated the claimant for his lower back pain from September of 2016 to December of 2017. The claimant reported eased back pain as a result of treatment. (R. 598, 601).

The claimant sought treatment at the Birmingham VA Medical Center as well for his physical impairments. In September of 2017, Dr. Jacob P. Elrod diagnosed the claimant with atrial fibrillation, benign essential hypertension, obesity, and reflux. (R. 419). Dr. Delphine Powell

diagnosed the claimant with chronic Hepatitis C and cirrhosis of the liver in November 2017. (R. 438).

The claimant sought treatment for his left elbow and foot pain at the Birmingham VA Medical Center. Occupational therapist Marie G. Godbey and attending physician Dr. Terrence M. Shaneyfelt treated the claimant's left elbow because of its previous dislocation. (R. 426). Dr. Chaitanya Allamneni treated the claimant's plantar fasciitis in his left foot. (R. 662).

Dr. Emmanuel Odi, at Excel Internal Medicine, treated the claimant in February of 2018 and diagnosed the claimant with benign prostatic hyperplasia, reflux, chronic kidney disease, erectile dysfunction, and atrial fibrillation. (R. 628-30).

On March 1, 2018, Dr. Robert G. Haas' conducted a physical residual functional capacity assessment of the claimant at the request of the Social Security Administration by reviewing the claimant's records. Dr. Haas concluded that the claimant could occasionally lift fifty pounds and frequently lift twenty-five pounds; could stand or walk up to six hours out of an eight-hour work day; was not limited in the amount of weight he could push or pull; should not climb ladders, ropes, or scaffolds; and could frequently balance, stoop, kneel, crouch, crawl, and climb stairs. Dr. Haas noted that the claimant's physical exams were normal, and, considering all the evidence and giving the claimant the benefit of the doubt, he found that the claimant was not disabled because of his physical limitations. (R. 79-88).

The Department of Veteran's Affairs sent a letter to the claimant on April 12, 2018 informing him that it denied his service connection for hypertension and atrial fibrillation. (R. 242-43).

*The ALJ Hearing*

The ALJ hearing took place on September 5, 2018 via video teleconference. The claimant testified that he lived at home with his wife; had four grown children; attained a GED; and had an

17

associate degree in accounting. The claimant also said he served four years in the Marine Corps. (R. 39-45).

The claimant testified that he retired from the U.S. Postal Service on December 30, 2017, his sixtieth birthday. The claimant said he worked there for 34 years and retired on his sixtieth birthday to avoid penalty and receive all his retirement benefits. However, the claimant said he left work in early November because his cardiologist, Dr. Sander-Lee, wrote him a note so he could use his sick leave until he retired because the month of December involved the most lifting and he "couldn't do another December." Also, the claimant said he wanted to work until he was sixty-two years old but could not keep working at the Post Office in response to the ALJ's statements regarding how the claimant applied for his VA benefits, retired, and applied for Social Security benefits "kind of all at the same time." (R. 53, 56).

The claimant alleges that, as of December 2017, he stopped working because his job at the U.S. Postal Service became "overwhelming." The claimant said the job overwhelmed him because he lifted heavy items that weighed over seventy pounds and he "just couldn't do it anymore."

When asked about his mental issues, the claimant said a psychiatrist at the VA diagnosed him with PTSD in June 2011 because of his time on active duty in the Marine Corps. However, the claimant said he did not seek PTSD treatment until he went to the VA in August of 2017 because he was unaware of the available treatment options and disliked the effects of the psychotropic medication prescribed by his "personal doctor." (R. 49, 60-62).

In August of 2018, the claimant said the VA diagnosed him with Major Depressive Disorder after he reported anger outbursts, suicidal ideations, flashbacks, and even called a VA mental health crisis line.  The claimant said Dr. Taylor, a psychologist, first treated him for PTSD treatment in 2018. The claimant said a friend referred him to Dr. Taylor, and he saw Dr. Taylor

because he lacked confidence in the doctors at the VA and wanted a "second opinion" on his PTSD diagnosis. (R. 64-65).

The claimant noted his PTSD affected his concentration and ability to read because he would "lose concentration" after reading only "a page or two." Also, the claimant said his lack of concentration prevented him from opening his own Allstate office. The claimant said he obtained all the materials but failed to continue because he could not concentrate. "It was a thought, but it never happened." He said his depression and PTSD affected his ability to work because he was very moody, could not stay asleep at night, and he had a lot of words with management because he "was in a bad situation." He continued to work at the Post Office although he had these symptoms and stated that "I worked through it." (R. 50, 52).

The claimant said his PTSD was service connected and that he received 100% disability from the VA. He suffered from suicidal thoughts after his time in the military. Although the claimant was never in a combat position, he described his experience in the Marine Corps as "culture shock," and said it "put [him] in some positions that [he] had never witnessed." (R. 49-52).

Regarding his physical limitations, the claimant said his lower back problems, dislocated elbow, and foot problems exacerbated his inability to do his job as well. Then, in response to questioning by the claimant's attorney, the claimant said, on a scale of one to ten with ten being the worst, his back pain was a seven. The claimant said he could not stand for longer than twenty minutes; sit still for longer than an hour; walk around an entire football field; or lift more than five or six pounds. The claimant spent four hours a day in his recliner and cannot lay down without his CPAP machine because of his sleep apnea. (R. 45-46, 50-52).

The claimant testified that he first experienced heart problems in December of 2015. The claimant went to Brookwood Medical Center where Dr. Anabella Sander-Lee treated his heart issues. The claimant said Dr. Sander-Lee diagnosed him with atrial fibrillation and he had a cardiac

ablation, cardioversion, arteriogram, and heart catherization. The claimant said the physical strain

of his job "put [him] right back into [the] ICU" after he was "off from work the first time" in

December of 2015 because of his heart issues. The claimant said he went to the ICU again in

January of 2016 but had not returned since. He recently visited Brookwood Medical Center in June

for irregular heartbeat. The claimant had a heart catherization that revealed minimal blockage, but

the claimant said his heart beat improved when he took his heart medications, which included

Eliquis, Toprol, Ramipril, aspirin, and Omeprazole. (R. 47-49, 306).

The ALJ examined Vocational Expert Marissa Howell and presented her with several

hypothetical scenarios. Marissa Howell identified the work the claimant performed over the last

fifteen years as of a mail handler, classified as semi-skilled, light work. But, Mrs. Howell said that

the claimant performed the job at the heavy physical demand level per his testimony. (R. 66).

Next, the ALJ posed a hypothetical question to Mrs. Howell involving an individual of the

claimant's same age, education, and past work history who was limited to work at the medium

level of exertion; could frequently climb ramps and stairs, but never ropes, ladders, or scaffolds;

could frequently balance, stoop, kneel, crouch, and crawl; should not work in environments with

exposure to hazardous conditions, such as unprotected heights or moving machinery; and should

not work in environments with concentrated exposure to extreme heat, cold, humidity, wetness, or

pulmonary irritants. Mrs. Howell said that such an individual could work in the claimant's previous

job as a mail carrier as described in the DOT, but not as the claimant said he performed it. (R. 65-

66).

Then, the ALJ further restricted the scenario and added that the individual would be capable

of understanding, remembering, and carrying out simple work instructions, but not those that are

more detailed or complex; could adapt to occasional workplace changes; could frequently interact

with the public, coworkers, and supervisors; and would be capable of sustaining sufficient attention

20

and concentration to perform work at this level for at least two-hour blocks of time with normal breaks in an eight-hour day. Mrs. Howell said the additional restrictions would preclude the claimant's past work, but that the claimant could perform other work at the unskilled, medium physical demand level, such as a cardboard box maker, with 693,170 jobs available nationally; as a handle assembler with 202,600 jobs available nationally; or a dishwasher with 504,483 jobs available nationally. (R. 67-68).

The ALJ then asked Mrs. Howell whether an individual with the restrictions set out in the first hypothetical but without the additional mental restrictions could perform the claimant's past work as described by the DOT if that individual was limited to the light level of exertion. Mrs. Howell said that such an individual would be able to perform the claimant's past work as described by the DOT. (R. 68-69).

Mrs. Howell testified that an individual limited to sedentary work could not perform the claimant's past work and would not have any skills transferrable to sedentary work.  (R. 69-70).

The claimant's attorney asked Mrs. Howell whether an individual with the same set of limitations as those identified in the ALJ's first hypothetical, but, because of Major Depressive Disorder and PTSD, could not maintain attention, concentration, or pace for periods of at least two hours, would be able to find employment. Mrs. Howell responded that such circumstances would eliminate all work in the national economy. Finally, the claimant's attorney asked whether an individual with the same limitations as the ALJ's first hypothetical, but also with an absenteeism rate of two or more days a month, would be able to find work. Mrs. Howell said that limitation would eliminate all jobs in the national economy. (R. 70-71).

*The ALJ Decision*

In a decision dated December 4, 2018, the ALJ found that the claimant was not disabled. The ALJ found that the claimant met the insured status requirements of the Social Security Act

through December 21, 2022, and that the claimant had not engaged in substantial gainful activity since December 30, 2017, the alleged onset date. Although the claimant reported earnings during the first quarter of 2018, the ALJ noted that the claimant testified he used sick leave during that time and did not engage in any substantial gainful activity after the alleged onset date. (R. 17-18).

Next, the ALJ found that the claimant had the severe impairments of heart arrhythmia, hypertension, degenerative joint disease, and lumbar strain. But the ALJ found then found the claimant's Hepatitis C, gastroesophageal reflux disease (GERD), obesity, chronic kidney disease, and obstructive sleep apnea to be non-severe because they were all medically managed.

The ALJ found the claimant's mental medically determinable impairments of PTSD and depression to be non-severe because, considered singly and in combination, they caused no more than minimal limitations. (R. 18).

To support this finding, the ALJ noted that, although the claimant took medication and went to counseling sessions for his mental impairments, the counseling session notes revealed nothing but "vague reports of symptoms" that improved with time and primarily stemmed from his marital discord and financial stressors instead of his military service.

Also, the ALJ stated that "[n]otably, even when the claimant reported mental health symptoms[,] he never alleged any actual difficulties perform[ing] the mental demands of work. He never complained of difficulties with attention, concentration, or getting along with others."  The ALJ also pointed to the claimant's daily activities to support that he could do work that required socialization, attention, concentration, and getting along with others:  exercising several days a week and participating in the MOVE! VA weight loss program; being involved in his church; enjoying doing things with his wife; and traveling to family reunions and out of the country. (R. 18).

Additionally, the ALJ found no evidence that suggested the claimant stopped working at the Post Office because of his mental impairments. The ALJ noted that the claimant planned his retirement for months and retired on his sixtieth birthday; had plans to travel around the world; indicated before his retirement that he intended to utilize his real estate license and open his own Allstate Insurance office; and applied for disability benefits three days after he retired. The ALJ stated that the claimant never reported having any mental or physical problems fulfilling the demands of his past work. (R. 17-18).

Next, the ALJ considered the four broad areas of mental functioning to determine the severity of the claimant's mental impairments and found that he was only mildly limited in his ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. The ALJ found that the claimant's reported issues in these areas, including his ability to concentrate, were inconsistent with his reported activities of daily living, including his ability to manage his finances; prepare meals; drive; manage his medications; finish what he starts; go places without reminders; shop in stores; attend church; spend time with family and friends; travel; go out to dinner; cooperate with others, including authority figures; read; bowl; do laundry; iron; *"pay attention for about 15 minutes"*; watch television; and follow written and spoken instructions. (R. 19) (emphasis added).

The ALJ noted the claimant's mental status examinations where he had goal directed thought processes; normal orientation; good attention and concentration; no disturbance in thought; euthymic mood; appropriate eye contact; cooperative and appropriate behavior; intact memory; and average intellect. The ALJ found that the claimant's mental medically determinable impairments were non-severe because they caused no more than mild limitations in all four areas of mental functioning. (R. 18-20).

Next, the ALJ determined that the claimant did not have an impairment or combination of impairments that medically met or equaled the severity of one of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. The ALJ found that neither the claimant, his representative, nor any examining or treating medical source reported that the claimant had an impairment that medically equaled the criteria of a listed impairment; that the evidence does not support the existence of an impairment that medically equaled or even closely approached the criteria of the Listing of Impairments; and that no medical evidence nor physician "designated by the Agency" suggested the claimant's impairments medically equaled any impairment in the Listing of Impairments. Thus, the ALJ concluded the claimant did not have an impairment or combination of impairments that medically met or equaled the severity of one of the impairments listed in the Listing of Impairments. (R. 20).

The ALJ found that the claimant has the residual functioning capacity to perform light work, with these additional limitations: can frequently climb ramps and stairs but never ladders, ropes, or scaffolds; can frequently balance, kneel, stoop, crouch, and crawl; cannot work in environments with hazardous conditions such as unprotected heights or moving machinery; and cannot work in environments with concentrated exposure to extreme heat, cold, humidity, wetness, or pulmonary irritants.  The ALJ included no mental functioning limitations in the residual functioning capacity assessment.  (R. 20-21).

 In making her residual functional capacity determination, the ALJ stated that she analyzed all the claimant's medically determinable impairments, both physical and mental, severe and non-severe, and found that they could reasonably be expected to produce the claimant's symptoms. However, the ALJ found that the claimant's statements about the persistence, intensity, and limiting effects of his symptoms were inconsistent with the medical evidence and other evidence in the record. (R. 21).

The ALJ acknowledged that the "claimant stated that he has PTSD from being an active duty Marine and *has problems with concentration* and anger outbursts" (R. 21). But the ALJ pointed to records that showed when the claimant had no suicidal thoughts; that his stressors included marital and financial problems that improved after he received service connected compensation for PTSD; that after his retirement he planned to keep busy working out; and that he planned to start his own Allstate Insurance office. The ALJ noted the visits in the record where the claimant had an euthymic mood, average intellect; normal orientation; good insight and judgment; intact memory; average intellect; and good attention and concentration.  (R. 25-30).

The ALJ also noted that the claimant began seeing Dr. Sterling Taylor monthly from December 2017 through at least August 2018 but found his opinion unpersuasive "given the lack of context as to any of the checked boxes" for each visit.  The ALJ acknowledged that Dr. Taylor's notes indicated that the claimant had a "depressed and anxious mood," but stated that he otherwise had good eye contact, normal speech, logical thought process; good insight, judgment, concentration, and attention; intact memory; and normal orientation.  (R. 26).

In contrast, the ALJ noted that she found the VA medical records persuasive because they contained lengthy descriptions of the claimant's mental condition at each appointment. The ALJ said that the VA's medical records that portrayed the claimant as keeping busy with his daily activities were inconsistent with the records from Dr. Taylor that depicted the claimant's depression as "serious."  The ALJ acknowledged that Dr. Taylor reported that the claimant found his job with the postal service overwhelming, but the ALJ stated that Dr. Taylor had no "first-hand knowledge of this [fact] other than the claimant's self-report and does not distinguish as to whether the claimant attributed difficulty with his job to its physical or mental requirements."  (R. 26).

The ALJ also noted that the claimant's mental functioning "improved significantly since his initial alleged onset date."  The ALJ pointed out that, by July 2018, the claimant reported

improvement in his intimacy and relationship with his wife and attributed the improvement to his approval of service-connected compensation and back-pay. The ALJ also emphasized how the more recent records note the claimant's self-proclaimed improvement and eager anticipation to travel to Barcelona, Spain. (R. 26).

The ALJ found unpersuasive Dr. Estock's opinion that the claimant was moderately limited in his mental functioning because it was "not consistent with the medical evidence." The ALJ stated that Dr. Estock's opinion was inconsistent with his own mental status examination in the record that showed that the claimant had "no disturbance in thought, goal directed thought process, normal orientation, intact memory, good attention and concentration, and average intellect." As further support for her finding that Dr. Estock's opinion was unpersuasive, the ALJ noted that the claimant could "manage his personal care, prepare meals, manage his medications, do laundry, iron, drive, leave home, shop in stores, manage his finances, watch television, bowl, read, spend time with family and friends, go out to dinner, attend church, ***pay attention for 15 minutes***, finish what he starts, follow written and spoken instructions, and does not need reminders to go places." (R. 30) (emphasis added). The ALJ also pointed out that the claimant "had multiple plans for retirement[,] such as selling real estate, traveling, and opening an Allstate franchise." (R. 30).

Relying on the vocational expert's testimony, the ALJ determined that the claimant could perform his past relevant work as a mail handler as generally performed at the light exertion level and, thus, was not disabled as defined by the Social Security Act from December 30, 2017 through the date of the ALJ's decision. (R. 30-31).

## VI.   DISCUSSION

The claimant argues that the ALJ erred because substantial evidence does not support her decision to exclude from the claimant's residual functional capacity any mental limitations regarding the claimant's ability to concentrate or pay attention. This court agrees.

26

The ALJ found that the claimant's major depressive disorder and PTSD were non-severe impairments at step two because she found that they only mildly limited his mental functioning. But because the ALJ found that the claimant had several other severe physical impairments at step two, she proceeded through the sequential process and stated that she considered all of the claimant's severe and non-severe impairments in determining the claimant's residual functional capacity.  The ALJ did not include any mental limitations in the claimant's residual functional capacity determination because her finding of only "mild" mental limitations did not mandate including them.  But the ALJ's RFC determination, which included no mental limitations because she found the claimant was only mildly limited in his ability to concentrate, lacks substantial evidence in the record.

The ALJ stated that, "even when the claimant reported mental health symptoms, he never alleged any actual difficulties perform[ing] the mental demands of work." The ALJ stated that the claimant "*never* complained of difficulties with attention, concentration, or getting along with others."  (R. 18) (emphasis added).  That finding is plainly wrong.

If the ALJ meant that the claimant never complained *prior* to his retirement or his alleged onset date of December 30, 2017 that he had trouble concentrating that statement is wrong.  He reported to Dr. Eubanks in October 2017 that he has "some trouble concentrating on things, such as reading the newspaper or watching television" and that his mental health symptoms made it "somewhat difficult" to work.  (R. 439-42).  And he reported to Dr. Taylor that he had just retired from the Post Office and that his job there was "overwhelming."

The ALJ discounted Dr. Taylor's inclusion of the claimant's statement that his job was "overwhelming" in his opinion letter because Dr. Taylor had no "first hand knowledge of this [fact] other than the claimant's self-report and does not distinguish as to whether the claimant attributed difficulty with his job to its physical or mental requirements."  (R. 26).  But seldom does a doctor

have "first-hand knowledge" of a claimant's difficulties. Regardless, the claimant did indicate that he was "overwhelmed" by his Post Office job and testified as to such at the hearing under oath.

And if the ALJ meant that the claimant never complained of trouble concentrating after his retirement that statement is also wrong.  The claimant, throughout the record, indicated that he had trouble concentrating. During his individual psychotherapy with his clinical social worker Ms. Fordyce and visits with NP Grace at the VA, the claimant reported trouble concentrating in November 2017 (before his alleged onset date), February 2018, March 2018, May 2018, June 2018, and July 2018.  The claimant told NP Grace in March 2018 that he had "difficulty concentrating" and described it as "getting 'side tracked' on tasks."  He also testified at the hearing that his PTSD affected his concentration and affected his ability to read because he would "lose concentration" after reading only "a page or two."

In his Function Report in February 2018, the claimant indicated that his depression and PTSD symptoms caused him to be able to "pay attention for about fifteen minutes."  The VE in this case testified that no jobs would be available for someone like the claimant if he could not maintain attention, concentration, or pace for periods of at least two hours at a time.  (R. 70-71).  But the ALJ seemed to actually *rely* on the fact that the claimant could "pay attention for about fifteen minutes" to *support* her finding that the claimant only had "*mild*" limitations in his ability to concentrate and pay attention.

When listing the claimant's reported daily activities to show that the claimant was only "*mildly*" limited in his mental functioning, the ALJ twice specifically included the claimant's ability to "pay attention for about fifteen minutes" as support for her finding.  But the claimant's report that he could only pay attention for such a short amount of time actually weighs against the ALJ's finding of a "mild" limitation, especially given the VE's testimony at the hearing that no jobs would exist for someone like the claimant who could not maintain concentration for at least

28

two hours.  The ALJ's reliance on the claimant's ability to concentrate fifteen minutes to support her "mild" limitation assessment flies in the face of substantial evidence to support her finding. Substantial evidence is "relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991).  A reasonable person would not accept the ALJ's reliance on evidence that actually supported the opposite conclusion reached by the ALJ.

To confuse matters further, the ALJ's reliance on the claimant's ability to maintain concentration for fifteen minutes is inconsistent with her statement that the claimant *never* reported any issues with his ability to concentrate.  *Compare* (R. 18) with (R. 19, 30).  Again, with the ALJ's conflicting statements and reliance on evidence that could support an opposite conclusion, the court is unclear whether substantial evidence actually supports the ALJ's ultimate determination to exclude from her residual functioning capacity determination any mental limitation regarding the claimant's ability to concentrate.

And the ALJ's purported reliance on the fact that the claimant could only pay attention for about fifteen minutes actually supports Dr. Estock's opinion that the claimant has moderate limitations in his mental functioning.  *See Royer v. Colvin*, 5:13-cv-1573-KOB, 2015 WL 661331 (N.D. Ala. 2015) (the VE testified that generally, an individual is required, in some capacity, to maintain attention and concentration for *unskilled*, one-and-two-step tasks for two-hour periods to maintain employment).  Someone who can only pay attention for fifteen minutes would *at the very least* have a moderate limitation in his ability to concentrate or pay attention.

Dr. Estock's opinion is the only *medical* opinion in the record to specifically assess the claimant's mental functional limitations.  Although Dr. Estock did not examine the claimant personally, he reviewed all of the claimant's medical records and gave his medical professional opinion based on those records.  Dr. Estock specifically noted that the claimant could maintain

concentration for about two hours with all customary breaks; that he would need a "well-spaced work environment" for "maximum concentration";  he could carry out short, simple tasks and instructions, but would have "more difficulty with more detailed tasks and instructions"; and had a "severe" disorder.

But the ALJ found Dr. Estock's opinion "unpersuasive" because it was "not consistent with the medical evidence."  To the contrary, Dr. Estock's opinion is consistent with the other medical evidence in the record, including NP Grace's diagnoses that the claimant had major depressive disorder, recurrent and "*moderate*" in March, June, and July 2018.  And the court notes that the ALJ strongly favored the records from the VA to support her decision because those records contained lengthy descriptions of the claimant's mental condition at each  appointment.  The VA records showing NP Grace's diagnosis of major depressive disorder "*moderate*" and the claimant's continued reports regarding his trouble concentrating preponderate against the ALJ's finding of a "mild" limitation in the claimant's ability to concentrate.

True, Dr. Taylor's opinion contained checked boxes that seemed confusing; had checked-boxes for "good" concentration and attention; and contained no narrative to explain his findings. But his letter to the Social Security Administration, written at its request, indicated that he could not opine whether the claimant was disabled such that he could not work because of his limited personal interaction with the claimant; at the time of the letter he had only seen the claimant twice. And in his letter, Dr. Taylor did specifically state his diagnosis of the claimant as "Major Depressive Disorder" that he described as "serious" and indicated that the claimant had complained of "poor concentration."

The ALJ also found that the claimant's plan to open his own Allstate office after his retirement was evidence that he was only mildly limited in his ability to concentrate. But what the ALJ completely failed to even mention in her opinion is that the claimant never carried through

with his intentions because he testified that his inability to concentrate prevented him from opening his own Allstate office; he obtained all the materials regarding opening an office but failed to continue because he could not concentrate.  "It was a thought, but it never happened."  The claimant testified that he wanted to continue working until he was 62-years-old, but that he was overwhelmed with his job at the Post Office, so he planned his retirement as soon as he could without penalty.  The fact that he had intentions to work after his retirement at the Post Office does not mean that he, in fact, could sustain a 40-hour workweek with his mental and physical impairments after his alleged onset date in December 2017.

As evidence to support her finding that the claimant was only mildly limited in every area of his mental functioning, the ALJ also stated that the claimant's reports of his mental symptoms were "vague."  The ALJ did not explain how the claimant's reports of his symptoms were "vague," or which symptoms were "vague."  To the contrary, when it examined the record in this case, the court saw specific, not vague, reports of having "trouble concentrating on things such as reading the newspaper or watching television" and "getting 'side-tracked' on tasks"; having thoughts that he would be better off dead; having specific suicidal thoughts "about driving his car into oncoming traffic"; having difficulty falling asleep; having nightmares about running from danger; having a suicidal ideation of hurting himself with a lawnmower blade; having thoughts of driving his car off elevated roads when travelling; and having emotional intimacy issues with his wife.

True, the claimant's records show that the claimant's mental condition improved some in 2018 after starting Buproprion, and that he reported "good" concentration at times.  But as the claimant told Dr. Elrod in 2017, his depression and PTSD have symptoms that "wax and wane." Even after the claimant started taking Buproprion and reported some improvement, he continued to report that he had trouble concentrating in July 2018.  In his most recent session in the record with his counselor on July 24, 2018, the claimant reported his "ongoing issue with negative thoughts and

other symptoms of depression," and the mental status examination section for that visit indicated that the claimant had an anxious, frustrated, congruent mood and limited insight and judgment. So even though he had some improvement, he still showed depression symptoms including trouble concentrating. (R. 698-700).

And the facts that the claimant looked forward to several trips, exercised to try to lose weight and spent time with his wife do not negate his medically diagnosed Major Depressive Disorder and PTSD that he claims causes trouble concentrating and affects his ability to sustain work during a 40-hour workweek. The demands and stressors of mental functioning at home and in the community differ from the mental stressors of working a full-time job. According to the Social Security Regulations, "If you are able to use an area of mental functioning at home or in the community, we will not necessarily assume that you would also be able to use that area of function in a work setting where the demands and stressors differ from those at home." 20 C.F.R. § 404, Subpart P, Appendix 1, Listing 12:00(F)(3)(c). None of those activities would require an ability to concentrate for two hours at the level necessary in the work environment, or for fifteen minutes for that matter. But the fact that he did *not* carry through with his intent to try to open an Allstate office because of his inability to concentrate--a fact the ALJ ignores and fails to discuss--supports that his limitations in his ability to concentrate are more than "mild."

The court finds that substantial evidence in the record does not support the ALJ's reasons for finding that the claimant's major depressive disorder and PTSD only mildly limited his ability to concentrate and for failing to include any mental limitation regarding concentration in the claimant's residual functional capacity.

This court's decision to reverse and remand this case to the Commissioner does not necessarily mandate on remand a finding that the claimant is disabled. In one of her hypotheticals to the VE, the ALJ included the mental limitations regarding concentration espoused by Dr. Estock.

32

The VE testified that the claimant could not perform her past work at the Post Office with those mental limitations, but jobs existed at the unskilled, *medium* exertion level that the claimant could perform.  But, the ALJ ultimately found that the claimant's physical limitations precluded medium work and assessed his residual functional capacity at the light-level of exertion with no mental limitations.  So, the record at this point contains no evidence that any jobs exist that the claimant could perform at the light level of exertion with any mental limitations involving concentration or attention.

## VII.   CONCLUSION

For the foregoing reasons, this court will REVERSE and REMAND the decision of the Commissioner of Social Security.

The court will enter a separate order in accordance with the Memorandum Opinion.

DONE and ORDERED on this 25th day of September, 2020.


_____
**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE